Argued February 11, decided March 24, modified on rehearing April 30, 1908.

## GAFFNEY *v.* GAFFNEY.

[94 Pac. 561; 95 Pac. 334.]

DEEDS—VALIDITY—EVIDENCE—SUFFICIENCY—FRAUD.

In an action to cancel a deed to plaintiff's sons, and to cancel certain stipulations entered into between the parties, executed to restore family relations and friendship between the plaintiff and his wife and sons, the evidence examined, and *held* to warrant the finding of the trial court that defendant's professions of friendship for plaintiff were made in bad faith, so as to entitle him to have the instruments canceled for fraud.

From Clackamas : THOMAS A. MCBRIDE, Judge.

This is a suit by John Gaffney, Sr., against Michael Gaffney, Daniel Gaffney and Bridget Gaffney to cancel

a deed to real property made by the plaintiff to Michael and Daniel Gaffney, and to cancel and annul certain stipulations filed in the case of *Bridget Gaffney* v. *John Gaffney, Sr.*, and in the case of *John Gaffney, Jr.*, v. *John Gaffney, Sr.*, on the ground of want of capacity to execute same, and the further ground that they were procured from him by fraud and undue influence. From a decree in favor of plaintiff, defendants appeal.

AFFIRMED.

For appellant there was a brief over the names of *Mr. Dan J. Malarkey* and *Hedges & Griffith,* with oral arguments by *Mr. Malarkey* and *Mr. Franklin T. Griffith.*

For respondent there was a brief over the names of *C. D. & D. C. Latourette* and *Mr. Thos. F. Ryan,* with oral arguments by *Mr. Chas. D. Latourette* and *Mr. Ryan.*

MR. JUSTICE EAKIN delivered the opinion of the court.

This is a suit brought by John Gaffney, Sr., against the defendants Bridget Gaffney, his wife, and Michael and Daniel Gaffney, his sons, to cancel a deed made by plaintiff to the two sons on November 23, 1903; a stipulation signed November 18, 1903, in the case of *John Gaffney, Jr.,* v. *John Gaffney, Sr.,* and his wife, and a stipulation filed December 7, 1903, in the case of *Bridget Gaffney* v. *John Gaffney, Sr.,* upon the grounds of want of capacity to execute the same, and that they were procured from him by fraud and undue influence. As a result of the trial the court found for the plaintiff, and rendered a decree accordingly, and defendants appeal.

All of these instruments were the result of an attempted settlement of matters in litigation, and to accomplish a reconciliation between the plaintiff and his wife then separated. Plaintiff and defendant Bridget have three sons, John, Jr., Michael, and Daniel, all over 21 years of age. John, the eldest, is married and has not lived in the home of the parents for several years. The other two boys still reside with the parents, and in these

family differences, John took the part of the father, and Michael and Daniel of the mother.

On November 18, 1903, plaintiff owned an undivided two-thirds and his wife one-third interest in 70 acres of land at Harmony, near Portland, of the probable value of $14,000, on which they had resided for many years, and also own, in the same proportion, 44 acres of other land near Oregon City, of small value, and a crop just harvested on the 70 acres, worth about $1,500, and other personal property worth $400 or $500, besides about $2,900 in money; and at that time John Gaffney, Sr., and Bridget jointly held the title to a farm of 56 acres near Oregon City, originally purchased by John Gaffney, Jr., $1,200 of the purchase price of which had been loaned to him by his father, who held a mortgage as security therefor. Subsequently John, Jr., had conveyed the place to his parents, as he claimed, in trust for himself, and on November 18, 1903, there was a suit pending in the Circuit Court for Clackamas County, brought by John, Jr., against his parents, to compel a reconveyance to him of said land. There was also a suit pending by Bridget Gaffney against John Gaffney, Sr., to establish her right to one-third of the $2,900 in money, and to secure possession thereof. A few weeks prior to this time, there being trouble between plaintiff and the defendants, plaintiff left the home and took with him the $2,900, which had been kept in the house, and placed it in a bank in Oregon City, and thereafter made his home with John, Jr.

There is considerable evidence in the record as to the property interests and married relations existing between the husband and wife, from their marriage up to this time. But their respective interests in the property were not questioned, except as to the $2,900; and all these prior matters are immaterial to these issues, except as tending to show that they had not been living together harmoniously.

On November 18, 1903, all these parties met at the courthouse in Oregon City, that being the time set for the trial of the two cases above mentioned, and on the morning of that day the trials were postponed until the next term of the court, and it was then proposed by their friends that the family get together and settle their troubles out of court and without the aid of their lawyers, which they did, resulting in the deeds and stipulations. By that settlement, John, Sr., and wife conveyed to John, Jr., free from incumbrances, the 56-acre farm, and to Michael and Daniel the home place, each of the three sons agreeing to pay $100 a year to the parents as long as they lived, plaintiff to pay to his wife one-third of the money, namely, $980, the plaintiff to take the crop on the home place and pay his wife $500 for her interest therein, which was done. The agreement for the settlement and the first stipulation were consummated on November 18th, the deeds made on November 23d, and the money paid and a final stipulation made between plaintiff and his wife on December 7th.

After November 18th there was much trouble between John, Sr., and Michael and Daniel, in which Bridget took the part of the sons. This, however, can have no bearing upon the merits of this suit, except as tending to show bad faith in their professions and promises of friendship and reconciliation made at the settlement. John Schlegel was present at this settlement at the suggestion of Mrs. Gaffney and Daniel, and he says: "They wanted me to get peace in the family." Mrs. Stevens was brought there by Mrs. Gaffney, and she says: "She just asked me to come up to Oregon City. That is all I know." When Mrs. Stevens was asked, "Did you know what you were to come for?" she said: "Well, I think it was to get reconciled or something. I don't know." Mrs. Sechtem was brought by Mrs. Gaffney evidently for the same purpose, thus clearly indicating that, although it was the date set for trial, Mrs. Gaffney came to Oregon City that

day for the purpose of effecting a settlement; and the day was put in by herself, Michael, and Daniel and these friends to accomplish that end, not alone to effect a settlement of the matters in litigation, but to procure the transfer of the home place. The title to that was not in dispute, nor was the disposition of it under consideration; but it seemed to have been the principal purpose of Mrs. Gaffney to get the title to that place transferred to Michael and Daniel.

Plaintiff had been suffering from blood poisoning in his hand for two or three weeks prior to this time; had had a fight with Daniel, and trouble with Michael; and had left home and was living with John, Jr., feeling that he was driven out. He came to Oregon City that day to attend the two trials; and under these conditions the overtures of friendship were commenced, first, from the friends, and then from his wife and the boys. A few drinks of whisky were furnished or participated in to some extent by the women, until, as some of the witnesses say, he was "under the influence of liquor; feeling good; pretty happy." He and his wife had previously been separated, a reconciliation having been subsequently brought about; and it is clear that Mrs. Gaffney gave John, Sr., to understand that they would again be reconciled, and she would live with him thereafter, and that the harmony of the whole family would be re-established, and he received back to the home as head of the family. His wife and Michael and Daniel shook hands with him in token of renewed friendship. John, Jr., says: "Father's talk was principally about being reinstated and recognized at the home. Well, he wanted the privilege to go back there and live, or the privilege to build a cabin on one part of the place, or to buy a house and lot in some other locality, so he and my mother would live together the balance of their days. Yes, sir; that is the way I understood the settlement—that everything was to be harmonious. Well, he was simply under the influence of

liquor, and seemed to think everything was all right."
Schlegel says, as he understood: "It was that it would
be all settled, and they would live together peaceably as
man and wife and children. That was my understanding
what it was." Mrs. Stevens says as to the result of the
agreement: "I thought they were reconciled. I thought
so." Plaintiff says: "Mrs. Gaffney came to me in the
basement of the courthouse, and she said, 'I want this
trouble stopped,' she said. And she said: 'I've decided
to deed away my one-third interest in the home place,
away to the boys, if you will deed your two-thirds interest
away to them, and we will get a little cabin and live by
ourselves.' "

In these settlements there was no consideration mov-
ing to the plaintiff. John's land was conveyed to him
free from incumbrances. Mrs. Gaffney was given all she
had sued for, and was paid $500 for her share of the
crop, being all she claimed. Plaintiff's interest in the
home place, worth about $9,000, was conveyed to Michael
and Daniel, leaving nothing for him but harmony and
reconciliation, and evidently the promise of even that was
made in bad faith, both by Mrs. Gaffney and Michael and
Daniel. The reservation in the deed also indicates that
the grantors understood that they had reserved some in-
terest in the place by providing that "said grantees, or
either of them, shall not sell, mortgage, or place any in-
cumbrance on said land during the lives of said grantors,
or either of them, without their written consent."

It is apparent that it was a preconcerted plan on the
part of Bridget, Michael, and Daniel to secure from the
plaintiff the title to the home place, and their professions
of friendship, the influence of the friends, and the prom-
ise of renewed family relations were all made in bad
faith, and without any intention to fulfill the same. And
such false professions of restored friendship and marital
relations made by the wife to the husband, and of re-
newed friendship and restoration of family relations by

the sons to the father, with no intention by either to fulfill them, but made only to influence the husband and father to convey the land to the sons, and, upon obtaining the deed, immediately renewing hostilities and estrangements against him, amounts to a fraud upon him, and are sufficient to entitle him to relief: *Jennings* v. *Jennings,* 48 Or. 69 (85 Pac. 65).

Without reviewing the evidence at length, we think that it is sufficient to sustain the findings of the lower court; and the decree is affirmed.                AFFIRMED.

---

Decided April 30, 1908.

## ON PETITION FOR REHEARING.

[95 Pac. 334.]

MR. JUSTICE EAKIN delivered the opinion of the court.

Defendant asks that the decision of this court be modified, to the extent that the judgment rendered by the lower court in favor of plaintiff and against Mrs. Gaffney for the sum of $1,480 be set aside, and the settlement of the matter therein involved be permitted to stand, maintaining that of the $2,900 cash on hand, the wife was entitled to one-third, being the amount paid to her in the setltement; but this claim is not conceded. It was the subject of the litigation in one of the suits pending at the time of the settlement, and the rights of the parties thereto are not before us for consideration. This affects $980 of the $1,480. The remaining $500 was the value of one-third of the crop on the home place. It appears that it was plaintiff's proposition to pay the wife $500 for her one-third thereof, and that plaintiff thereupon removed and marketed the crop, and cannot now restore Mrs. Gaffney to her former condition in relation thereto; and it will be inequitable to permit him to retain the crop and also recover the $500 from Mrs. Gaffney.

Therefore the decree of the lower court will be modified, to the extent that the judgment in favor of plaintiff for $1,480 will be reduced to $980, and in all other things affirmed.                MODIFIED AND AFFIRMED.